Non-Confidential

UNITED STATES COURT OF INTERNATIONAL TRADE
Before: Hon. Timothy M. Reif, Judge

| | |
|---|---|
| Elysium Tiles, Inc and Elysium Tile Florida, Inc., <br><br> Plaintiffs, <br><br> v. <br><br> United States, <br><br> Defendant <br><br> and <br><br> The Coalition for Fair Trade in Ceramic Tile, <br><br> Defendant-Intervenor. | Court No. 23-00041 |

**MEMORANDUM OF LAW IN SUPPORT OF THE
RULE 56.2 MOTION OF PLAINTIFFS ELYSIUM TILES, INC
AND ELYSIUM TILE FLORIDA, INC.
FOR JUDGMENT UPON THE AGENCY RECORD**

David J. Craven, Esq.
CRAVEN TRADE LAW LLC
3744 N Ashland Avenue
Chicago, Illinois 60613
Tel. 773-709-8506
David.craven@tradelaw.com
Counsel for Plaintiffs

Dated: August 31, 2023

Table of Contents

Table of Contents.....................................................................................................i

Table of Authorities............................................................................................ ii

I.    Introduction...............................................................................................1

II.   Statement Pursuant to Rule 56.2(c)........................................................2

     A. Administrative Determination Under Review...........................................2

     B. Issues of Law ..........................................................................................2

     C. Summary of Arguments ..........................................................................3

     D. Statement of Facts .................................................................................5

III.  Standard of Review...................................................................................19

IV.  Argument ..................................................................................................21

     A. The Department Should Not Have Held an Ex Parte meeting
        with Petitioner...........................................................................................21

     B. The Department Should Have Issued an Adequate
        Memorandum of the Ex Parte Meeting .................................................25

     C. The Department did not consider the Express Language of the
        Order and Did not Properly Apply Language to the Nature of
        the Goods..................................................................................................27

         1. The Composite Marble Tile is Not Within the Written
            Scope Language ................................................................................28

         2. The Operations Undertaken on the Raw Materials are
            more than Minor Processing Operations..........................................31

         3. The Marble is More than "Mere" Decoration...............................34

V.    Conclusion ................................................................................................36

Table of Authority

**Court Cases:**

*Ad Hoc Shrimp Trade Action v. U.S.*, 675 F. Supp. 2d 1287 (Ct. Int'l Trade 2009)..................................................................24

*Alsthom Atlantique v. United States,* 787 F.2d 565 (Fed.Cir. 1986) ...............21, 27

*Best Power Tech. Sales Corp. v. Austin*, 984 F.2d 1172 (Fed.Cir.1993) ...............35

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 95 S. Ct. 438, 42 L. Ed. 2d 447 (1974) ...................................................21

*Bridgestone Americas, Inc. v. U.S.*, 710 F. Supp. 2d 1359, 1367 (Ct. Int'l Trade 2010).........................................................................24

*Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012) ........................................................21

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842 (1984)..........................................................................19, 20

*Ericsson GE Mobile Communications, Inc. v. United States,* 60 F.3d 778 (Fed.Cir.1995)...................................................................20, 27

*FAG Italia S.p.A. v. United States,* 110 F.Supp.2d 1055 (Ct. Int'l Trade 2000) ...................................................................................24

*Fujitsu Gen. Ltd. v. United States,* 88 F.3d 1034 (Fed. Cir. 1996).........................20

*Gerber Food (Yunnan) Co., Ltd. v. U.S.*, 387 F. Supp. 2d 1270, (Ct. Int'l. Trade 2005)......................................................................24

*Int'l Bus. Machs. Corp. v. U. S.*, 201 F.3d 1367 (Fed.Cir.2000) ............................35

*King Supply Company LLC v. U.S.*, 674 F.3d 1343 (Fed. Cir. 2012) ..............20, 27

*NEC Corp. v. United States,* 151 F.3d 1361 (Fed.Cir.1998)..................................24

*Nippon Steel Corp. v. U.S.*, 118 F.Supp. 2d 1366 (Ct. Int'l Trade 2000)................................................................26

*NSK Ltd. v. United States*, 115 F.3d 965  (Fed.Cir.1997) ......................................35

*Pesquera Mares Australes Ltda. v. United States,* 266 F.3d 1372 (Fed. Cir. 2001).....................................................................19, 35

*Royal Brush v. United States,* Court No. 2022-1226 (Fed. Cir. 2023)....................22

*SKF USA, Inc. v. United States.* 254 F.3d 1022 (Fed. Cir. 2001) ..........................21

*Smith Corona Corp. v. United States,* 915 F.2d 683 (Fed.Cir.1990) .................21,27

*Tung Mung Dev. Co., v. United States*, 354 F.3d 1371 (Fed. Cir. 2004) ...............21

*Ugine and Alz Belgium, Nv v. U.S.*, (Ct. Int'l Trade 2007) .....................................24

*Wheatland Tube Co. v. U.S.,* 495 F.3d 1355 (Fed. Cir. 2007) ................................20

*Wheatland Tube Company v. United States,* 161 F.3d. 1365 (Fed. Cir. 1998) ....................................................................................................21, 27

Statutes:

19 U.S.C. § 1516a (a)(2)(B)(iii) ......................................................................2

19 U.S.C. §1516a(b) ......................................................................................19

19 U.S.C. §1673d(c)(5)..................................................................................19

19 U.S.C. 1677f(3)(B).................................................................................3, 25

Regulations and Rules:

Rule 56.2 of the Rules of the U.S. Court of International Trade .............................2

19 C.F.R. §351.104 ......................................................................................3, 25

19 CFR 351.305(a).........................................................................................22

## I.   __INTRODUCTION__

This is an appeal of the U.S. Department of Commerce's ("Commerce" or "the Department") Scope Ruling issued with respect to the Antidumping Duty ("AD") and Countervailing Duty ("CVD") Orders of Ceramic Tile from the People's Republic of China. Plaintiffs are U.S. importers who participated in the Scope Inquiry.

Elysium Tiles, Inc and Elysium Tile Florida, Inc. (collectively "Plaintiffs") assert the following errors in the Commerce's final scope determination:

- The Department did not deal fairly with the parties, holding an *ex parte* meeting and a factory visit with representatives of petitioner unbeknownst to plaintiffs;

- The Department failed to issue an appropriate memorandum of the *ex parte* meeting held between the Department and representatives of petitioner;

- The Department failed to provide a meeting of any kind for plaintiffs;

- The Department ignored the substantial operations undertaken on the raw materials which resulted in a new and different article of Commerce.   The essential character of the resultant product is provided by the valuable marble component;

- The Department ignored the express language of the order which holds that to be within scope the raw materials must be fused through a firing process

1

to produce a finished good and the uncontested fact that firing the finished

product would destroy the finished product; and

- The Department improperly found that the operations undertaken on the marble component were mere finishing operations and the marble component was "mere" decoration.

## II.   STATEMENT PURSUANT TO RULE 56.2(c)

### A. Administrative Determination Under Review

This action is brought pursuant to 19 U.S.C. § 1516a (a)(2)(B)(iii) to contest Commerce's Scope Ruling dated January 25, 2023 and served on the parties by certified mail on January 31, 2023.  Such ruling was issued in connection with the scope investigation in *Ceramic Tile from the People's Republic of China*. In the Final Results, Commerce found that plaintiffs' product fell within the scope of the order.

### B. Issues of Law

The Plaintiffs present the following issues.  In each instance, Commerce's decision was not based on substantial evidence on the record, and was arbitrary and capricious, an abuse of discretion, and not otherwise in accordance with law.  The issues are:

1. **Holding of *Ex Parte* Meeting.**  Whether Commerce's decision to hold an *ex parte* meeting with petitioner while also refusing to hold such a meeting with plaintiffs was unlawful and an abuse of discretion.

2.  **Failure to Document *Ex Parte* Meeting.**   Whether Commerce's failure to issue an adequate memorandum of the *ex parte* meeting, notwithstanding the dictates of 19 C.F.R. §351.104 and 19 U.S.C. 1677f(3)(B) requiring the official record to include memoranda of ex parte meetings, was unlawful and an abuse of discretion.

3.  **Failure to Properly Apply the Language to the Scope to the Nature of the Goods.** Whether the Department's Determination that the product was within the scope of the order ignored the plain language of the order and the nature of the goods.

C. <u>Summary Of Arguments</u>

- The Department's scope investigation was procedurally defective. The Department should not have held an *ex parte* meeting with the petitioner at the petitioner's production facility.   While *ex parte* meetings are permitted in antidumping duty investigations, scope investigations are conducted under different procedures and thus *ex parte* meetings in scope investigations should not be allowed.

- The Department compounded the error in holding the meeting by refusing to generate an adequate memorandum for the record providing details about such meeting.  Absent such record, plaintiff

has no meaningful way to address the facts and argument presented to the Department in secret by the petitioner.

- The Department refused to provide an opportunity for Elysium to have its own *ex parte* meeting with Elysium. The consistent practice of the Department, as approved by the Court, is that when the Department grants an *ex parte* meeting for one party, it must at least offer a similar meeting to other parties.

- The facts of record clearly establish that the product the subject of the scope ruling is outside of the scope of the order. The express language of the order states that the product must be "***fired so the raw materials are fused to produce a finished good***". The facts establish that the finished good is not fired, and that any firing occurs at an early stage of the production process. Quite to the contrary, if all the raw materials were filed, a finished good would not result and the finished good would be destroyed.

- The operations undertaken on the raw materials, including the marble, were substantial and were not minor processing operations. It is also clear that the marble component, which is also the most valuable component, is more than mere decoration and is functional.

D. **Statement Of Facts**

On June 1, 2020, the Department published AD/CVD orders on ceramic tile from the People's Republic of China. 85 Fed. Reg. 33089 (June 1, 2020).    The order defined the scope of the Ceramic Tile as follows:

> The merchandise covered by the order is ceramic flooring tile, wall tile, paving tile, hearth tile, porcelain tile, mosaic tile, flags, finishing tile, and the like (hereinafter ceramic tile). Ceramic tiles are articles containing a mixture of minerals including clay (generally hydrous silicates of alumina or magnesium) that are fired so the raw materials are fused to produce a finished good that is less than 3.2 cm in actual thickness. All ceramic tile is subject to the scope regardless of end use, surface area, and weight, regardless of whether the tile is glazed or unglazed, regardless of the water absorption coefficient by weight, regardless of the extent of vitrification, and regardless of whether or not the tile is on a backing. Subject merchandise includes ceramic tile with decorative features that may in spots exceed 3.2 cm in thickness and includes ceramic tile ''slabs'' or ''panels'' (tiles that are larger than 1 meter2 (11 ft.2)).

> Subject merchandise includes ceramic tile that undergoes minor processing in a third country prior to importation into the United States. Similarly, subject merchandise includes ceramic tile produced that undergoes minor processing after importation into the United States. Such minor processing includes, but is not limited to, one or more of the following: Beveling, cutting, trimming, staining, painting, polishing, finishing, additional firing, or any other processing that would otherwise not remove the merchandise from the scope of the order if performed in the country of manufacture of the in-scope product.

> Subject merchandise is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under the following subheadings of heading 6907:  6907.21.1005, 6907.21.1011, 6907.21.1051,    6907.21.2000,    6907.21.3000,    6907.21.4000, 6907.21.9011,    6907.21.9051,    6907.22.1005,    6907.22.1011, 6907.22.1051,    6907.22.2000,    6907.22.3000,    6907.22.4000,

6907.22.9011,      6907.22.9051,      6907.23.1005,      6907.23.1011,
6907.23.1051,      6907.23.2000,      6907.23.3000,      6907.23.4000,
6907.23.9011,      6907.23.9051,      6907.30.1005,      6907.30.1011,
6907.30.1051,      6907.30.2000,      6907.30.3000,      6907.30.4000,
6907.30.9011,      6907.30.9051,      6907.40.1005,      6907.40.1011,
6907.40.1051,      6907.40.2000,      6907.40.3000,      6907.40.4000,
6907.40.9011, and 6907.40.9051. Subject merchandise may also enter
under subheadings of headings 6914 and 6905: 6914.10.8000,
6914.90.8000, 6905.10.0000, and 6905.90.0050. The HTSUS
subheadings are provided for convenience and customs purposes only.
The written description of the scope of the order is dispositive.

On April 11, 2022 Elysium filed its scope ruling (P.R.[1] 1) and on April 28,
2022 the Coalition of Fair Trade in Ceramic Tile ("CFTCT") filed an objection
claiming that Elysium had failed to serve the Coalition with a copy of the scope
ruling application (P.R. 2).

On May 12, 2022 the Department rejected the scope ruling application (P.R.
4) and on May 24, 2022, Elysium filed a request to reconsider the rejection of the
scope application and established that CFTCT's objection was based on inaccurate
facts and that CFTCT had, in fact, been served. (P.R. 8, C.R.[2] 2) Elysium provided
to the Department an e-mail between counsel for plaintiffs and counsel for CFTCT
contemporaneous with the date of filing where counsel for CFTCT expressly agreed
to accept service by e-mail and acknowledged receipt of the scope ruling
application. See Request to Reconsider at Attachment 1. (P.R. 8 at 8-9, C.R. 2 at 8-

---

[1] P.R. = Public Document Number assigned by the Official Index to the Administrative Record

[2] C.R. = Business Proprietary Information Document Number assigned by the Official Index to
the Administrative Record

9)   The request for reconsideration also included the complete scope ruling application (P.R. 8, C.R. 2) and exhibits thereto (P.R. 9 to P.R. 12, C.R. 3 to C.R. 6).

On June 2, 2022 the Department initiated the scope ruling review (P.R. 15), on July 5, 2022 CFTCT filed a response to the scope ruling request, (P.R. 21) and on July 19, 2022 Elysium filed a reply to CFTCT's response (P.R. 24, C.R. 7).

On September 26, 2022 the Department conducted an *ex parte* visit to Florida Tile, a member of CFTCT. (P.R. 26) The Department issued a legally insufficient record of this *ex parte* meeting, failing to identify the time of the meeting and failing to provide an adequate summary of the matters discussed. (P.R. 26)   On October 11, 2022 Elysium objected to the *ex parte*  meeting held with Florida Tile on the basis that Florida Tile did not produce products similar to those produced by Elysium.  Elysium also requested that the Department grant Elysium its own meeting with the Department to address the production process. (P.R. 32) The Department did not reply to this objection, nor did it grant Elysium's request for a meeting.

On September 27, 2022, the Department issued a supplemental questionnaire to Elysium (P.R. 27) and on October 11, 2022 Elysium submitted its response to the supplemental questionnaire. (P.R. 31, C.R. 8)

On October 26, 2022, CFTCT filed comments on Elysium's supplemental

questionnaire response (P.R. 33) and on November 1, 2022 Elysium responded to the comments filed by CFTCT. (P.R. 36)

On January 26, 2022, the Department issued the final scope ruling. (P.R. 40)

In the scope application, Elysium established that the composite marble tile was manufactured in a complex manufacturing operation and had the following properties. As illustrated in the following photograph, the composite marble tile is made up of multiple layers of material.



Picture of CMT Showing Layers (Exhibit 2 to Scope Application, P.R. 9 at 10)

The tile is produced in six sizes – 300 by 300 mm, 300 by 600 mm, 600 by 600 mm, 800 by 400 mm, 800 by 800 mm, and 1200 by 600 mm. The tile is approximately 14 mm thick. The base, or bottom layer is made from porcelain, a vitrified ceramic, which if imported by itself, would be subject to the scope of the order. The second, or middle, layer consists of an aviation grade epoxy glue which is used to permanently bind the base layer and the top layer. The third layer consists

of top facing material made from nature stone, primarily marble. (P.R. 8 at 19)  Once installed, the end user only sees the top facing natural stone.   As illustrated in the following photograph, after installation the product appears to be made solely of natural stone, the user only interacts with the natural stone, and the natural stone provides the essential character. (P.R. 8 at 19, P.R. 9 at 13 )



Picture of CMT in use.  (Exhibit 2 to Scope Application P.R.  9 at 13)

The Materials used to produce Composite Marble Tile ("CMT") are as follows:

**The first layer is porcelain**, a white vitrified translucent ceramic made by taking a mixture of a mixture of materials and fired at a high temperature.  This is supplied to the producer of composite marble tile in flat sheets.  The raw material would be classified under HTS 6907.90.0051. (P.R. 9 at 17)

**The second layer is aircraft Grade Epoxy**, a specific grade of an epoxy resin with particularly strong binding capacity.   Epoxy is used to permanently join one

substance to another. While Epoxy can be cured by the application of temperatures just above the boiling point, it begins to degrade at higher temperatures. This material would be classified under HTS 3214.10.0020. (P.R. 9 at 17)

**The third layer is marble**, a metamorphic rock composed of re-crystalized carbonate materials (often calcite or dolomite). This is supplied to the producer of composite marble tile in large blocks. (P.R. 9 at 17)



Picture of Marble Blocks (Exhibit 2 to Scope Application P.R. 9 at 17)

This is non-agglomerated marble. The raw material would be classified under HTS 6802.21.5000.

The composite tile is produced by the following **production process.** The porcelain base-layer, the epoxy resin, and the raw blocks of marble are purchased. The porcelain base is purchased in large sheets and is subject to the following production processes:

a. The surface of the porcelain base layer has the glaze removed and the surface prepared to provide a good surface for adhesion of the marble to the base layer.

b. The porcelain is cut to wafers. (P.R. 9 at 18)

The marble is supplied in large blocks.



Picture of Large Blocks of Marble (Exhibit 2 to Scope Application P.R. 9 at 17)

The marble block must be substantially processed before the composite marble tile can be produced. Initially, the marble block is carefully inspected to make sure that the surface is in good condition and is not warped and has no stains or pink spots. If the marble is mesh-backed, which is added to maintain the stability of the marble in transport, the mesh is removed, and the block is "calibrated" and sliced into wafers.



Picture of Marble After Slicing (Exhibit 2 to Scope Application P.R. 9 at 18)

A wafer is a thin slab of marble double the thickness of the final marble layer. The wafers are cut into pieces approximately 6mm larger than the finished product. Thus, for a finished tile with dimensions of 600 * 600 mm, the facing marble will be 606 * 606 mm. (P.R. 9 at 17)

The porcelain base and the marble wafer are then subjected to a drying process. This is a critical step that ensures that the adhesive will adhere to both surfaces. The drying oven starts at 30º Celsius and is gradually raised to 100 º Celsius and lowered again to 40 º Celsius.

12



Drying of Material (Exhibit 2 to Scope Application P.R. 9 at 18)

These steps constitute the initial preparation of the materials. (P.R. 9 at 18)

The next stage is the actual production of the CMT.

The epoxy glue is prepared with a colorant to match the glue to the color of the marble. Epoxy uses a curing agent, and the appropriate amount of curing agent is added based on the climate and humidity. The ratio of curing agent to glue is 1 to 3%. (P.R. 9 at 19)

The Epoxy is applied to both the marble and the porcelain base.



Application of Epoxy (Exhibit 2 to Scope Application P.R. 9 at 19)



Application of Epoxy (Exhibit 2 to Scope Application P.R. 9 at 19)

The marble and porcelain base are combined together to form a sandwich of porcelain/marble/porcelain.   While the marble will eventually be the "top" layer, the production process first creates a "sandwich" and then splits the marble layer.

14



Stack of Undivided CMT "Biscuits" (Exhibit 2 to Scope Application P.R. 9 at 19)

The product is again inspected to ensure that the glue is being uniformly squeezed out from all four sides and that the marble and the porcelain are properly aligned.

The unfinished tiles are then subject to a curing process. Initially, the tiles are allowed to cure for 1 to 2 hours at room temperature.



CMT "Biscuits" Cooling (Exhibit 2 to Scope Application P.R. 9 at 19)

The tiles and then placed for 3 to 4 hours into a curing tunnel where they are cured by infrared radiation. The temperature in the curing tunnel starts at 30 º Celsius, is increased to 100 º Celsius and then reduced to 50 º Celsius during the course of the curing process.(P.R. 9 at 19)



Curing tunnel (Exhibit 2 to Scope Application P.R. 9 at 19)



Curing tunnel with product inside (P.R. 9 at 19)

This curing process ensures the complete curing of the adhesive, shortens production time and prevents the uneven glue application phenomenon.   At this point, the

marble top layer is permanently joined to the porcelain base.   The two cannot be separated without destroying the material.   At this time, the product is still unsalable as it consists of a "biscuit" of porcelain/marble/porcelain and the marble layer must be evenly split to generate two separate pieces each consisting of a porcelain base layer and a marble upper layer.  As each upper layer is from the same piece of marble, the surfaces are essentially identical.   This splitting process is a critical step as it takes a comparatively large block of marble and subdivides it into multiple pieces with nearly identical appearances and properties.

The splitter, pictured below, splits the porcelain marble porcelain article through the marble to produce two articles, both of which are marble/porcelain only.



Splitter (Exhibit 2 to Scope Application P.R. 9 at 20)

The raw CMT is then calibrated to a uniform thickness and is finished by a series of grinding and polishing operations. (P.R. 9 at 20).  It is important to note that while the porcelain base layer is produced by firing, neither the marble and the epoxy are subject to a separate firing process, nor is the combined marble/porcelain article subject to firing.  Quite to the contrary, the firing process would destroy the resultant

article.



Finisher and Polisher (Exhibit 2 to Scope Application P.R. 9 at 20).

Critically, the composite marble tile is not fired, thus the marble and the underlayment are not fused together. It is essential to note that if this product were fired, it would destroy the product.

## III.   STANDARD OF REVIEW

The Court will hold unlawful Commerce determinations that are unsupported by substantial evidence on the record or are not otherwise in accordance with law. 19 U.S.C. §1516a(b). To determine whether Commerce's interpretation and application of 19 U.S.C. §1673d(c)(5) is "in accordance with law," the courts review the statute to determine whether "Congress has directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). If the statute is silent or ambiguous with respect to the specific issue, the Federal Circuit has held that *Chevron* deference is owed Commerce's statutory interpretations as to appropriate methodology. *Pesquera Mares Australes Ltda. v.*

*United States,* 266 F.3d 1372, 1379 (Fed. Cir. 2001). That analysis entails determining whether Commerce's construction of an ambiguous statute is "permissible." *See Chevron,* 467 U.S. at 843. A "permissible" construction is understood in terms of reasonableness; only reasonable interpretations will be upheld by the Court. *See Fujitsu Gen. Ltd. v. United States,* 88 F.3d 1034, 1038 (Fed. Cir. 1996) *('Chevron* requires us to defer to the agency's interpretation of its own statute as long as the interpretation is reasonable."). To determine reasonableness, courts look to the express terms of the statute, the objectives of the statute, and the objectives of the statutory scheme as a whole. *Wheatland Tube Co. v. U.S.,* 495 F.3d 1355, 1361 (Fed. Cir. 2007).

In evaluating scope rulings, the primary tenet is that when Commerce is called upon to issue a scope ruling, it must take into account the plain language of the scope. The Federal Circuit stated:

> After an AD order is issued, Commerce is often called upon to issue "scope rulings" to clarify the scope of the AD order and determine whether particular products are included within its scope. *Walgreen,* 620 F.3d at 1352 (quoting 19 C.F.R. § 351.225(a)). In making such scope rulings, while the plain language of the AD order is paramount, Commerce must also take into account "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary [of Commerce] (including prior scope determinations) and the Commission." 19 C.F.R. § 351.225(k)(1); *Walgreen,* 620 F.3d at 1357.[2] Consequently, a scope ruling is a highly fact-intensive and case-specific determination.
> *King Supply Company LLC v. United States*, 674 F.3d 1343 (Fed. Cir. 2012) at 1345.

A key part of this is that Commerce cannot interpret an order such that it would change the scope of that order. As noted by the Federal Circuit:

> Although Commerce "enjoys substantial freedom to interpret and clarify its antidumping duty orders," it can neither "change them," *Ericsson GE Mobile Communications, Inc. v. United States,* 60

F.3d 778, 782 (Fed.Cir.1995), nor interpret them "in a way contrary to [their] terms," *Smith Corona Corp. v. United States,* 915 F.2d 683, 686 (Fed.Cir.1990). *See also Alsthom Atlantique v. United States,* 787 F.2d 565, 571 (Fed.Cir. 1986) (The International Trade Administration "cannot change the scope of an underlying antidumping determination [to exclude an article] when Treasury has *specifically* included [that] article within the scope of its underlying determination." (Emphasis in original)).

*Wheatland Tube Company v. United States,* 161 F.3d. 1365 (Fed. Cir. 1998) at 1370

It is axiomatic that Commerce may not exert its authority in an arbitrary or capricious manner. *See, e.g., Tung Mung Dev. Co., v. United States*, 354 F.3d 1371, 1378 (Fed. Cir. 2004). Commerce's decision will be set aside if it is arbitrary and capricious. *See, e.g., SKF USA, Inc. v. United States.* 254 F.3d 1022, 1028 (Fed. Cir. 2001). "{A} reviewing court must apply both standards {substantial evidence, and arbitrary and capricious or contrary to law}, while  "an agency's finding may be supported by substantial evidence," yet "nonetheless reflect arbitrary and capricious action." *Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284, 95 S. Ct. 438, 42 L. Ed. 2d 447 (1974). A scope ruling which impermissibly expands the scope of an order is arbitrary and capricious on its fact.

IV.  **ARGUMENT:**

A. **The Department Should Not Have Held an Ex Parte meeting with Petitioner.**

The Department should not have held an *ex parte* meeting with the petitioner. Department proceedings are on the record and are marked by openness where all parties are provided all of the relevant facts and arguments.  The regulations provide for an Administrative Protective Order requiring disclosure to counsel of all facts

and arguments.   (19 CFR 351.305(a))   Critically, the Courts have held that administrative trade actions should not be based on "secret" information and that due process requires that parties be provided with such information and an opportunity to respond.   In *Royal Brush v. United States,* Court No. 2022-1226 (Fed. Cir. 2023) the Federal Circuit stated:

> In any event, on its face, the denial of access to the redacted information here was prejudicial because it denied access to information on which the agency relied in reaching its decision.
> There is no basis for CBP to violate Royal Brush's due process rights by failing to provide the information on which it relied to Royal Brush.
> *Royal Brush* at 20.

This *ex parte* meeting allowed petitioner to provide "secret" information and argument about the purported production process of the CMT and about tile.   In this case, the petitioner made two substantive submissions (P.R. 21 and P.R. 33).   Such submissions were virtually devoid of facts regarding the production processes for the production of ceramic tile and characterized the operations undertaken by Elysium's producers as merely gluing marble to ceramic tile.   Such characterizations ignored the substantial operations both before and after the epoxying of the marble to the porcelain.   *Ex parte* meetings, particularly those which include visits to production facilities of petitioners, are not contemplated by the scope ruling process and such arguments, where only a single lawyer for the petitioner was present at the meeting, can reasonably be presumed to be more than legal arguments.

The Courts have generally allowed *ex parte* meetings in Antidumping duty investigations and reviews.   However, there are a number of differentiating factors between an investigation or review and the scope ruling process.

Initially, unlike an Antidumping duty or countervailing duty review or investigation, the Department does not conduct verifications or pay visits to foreign

facilities.   While the Department may, on occasion, visit domestic facilities, this is normally done in cases where the Department is unfamiliar with the product.  This does not apply in this case.  The petitioner **does not produce the merchandise the subject of this scope ruling request**, nor likely does it have the equipment or technical expertise to produce such merchandise.  Any such visit, at most, could inform the Department on the details of the production of ceramic tile, but petitioner did not elect to place any meaningful information about the production of ceramic tile on the record.  The visit cannot provide any meaningful understanding as to the nature of the merchandise the subject of the scope ruling nor its production process. Any discussions would be based on unsupported speculation by an entity that does not work with natural stone such as marble. Rather, at best, the meeting simply provided petitioner an opportunity to speculate in some way about the merchandise and the merchandise production process not withstanding a lack of experience with this type of product.  Petitioner would be able to make a secret argument either based on a questionable characterization of the facts, or more likely, a secret argument based on a fundamental misunderstanding of a production process not used by petitioner on materials not processed by petitioner.   In either case, details of such unsound argument were not disclosed to Elysium, and thus cannot be rebutted by Elysium.

Unlike an antidumping duty investigation or review, scope proceedings do not provide for the separate submission of legal argument in the form of cases briefs, nor for the holding of hearings.  Such argument and discussion, at most, comes through the substantive submissions of the party.  Providing one party an opportunity to make direct argument, in an *ex parte* meeting, while providing no opportunity for the other party to make direct argument, impermissibly changes the balance of the equities.

Such actions, whether or not intended, give the impression of favoritism – the

willingness to meet with one party and hear their arguments and positions in secret while refusing to provide a similar opportunity to the other side.  As noted in *Bridgestone Americas, Inc. v. U.S.*, 710 F. Supp. 2d 1359, 1367 (Ct. Int'l Trade 2010) "{t}he right to an impartial decision maker is unquestionably an aspect of procedural due process." *NEC Corp. v. United States,* 151 F.3d 1361, 1371 (Fed.Cir.1998); *see FAG Italia S.p.A. v. United States,* 110 F.Supp.2d 1055, 1061 (CIT 2000)

Even if the Court were to ordinarily find that Commerce can freely grant *ex parte* meetings, the granting of this *ex parte* meeting is improper.  This is because of the Department's refusal to address Elysium's objection to the meeting and the Department's refusal to provide Elysium a meeting where it could discuss the production process and address any "misinformation" presented in the *ex parte* meeting held with petitioner.  Such a decision is contrary to long-standing Department practice.  As noted in multiple Court decisions allowing *ex parte* meetings, if the Department grants an *ex parte* meeting to one party, it should offer an opportunity for such meeting to the other party.  (See *Bridgestone Americas, Inc. v. U.S.*, 710 F. Supp. 2d 1359, 1367 (Ct. Int'l Trade 2010) (See also *Ad Hoc Shrimp Trade Action v. U.S.*, 675 F. Supp. 2d 1287 - Court of Intl. Trade 2009 at FN 17, *Ugine and Alz Belgium, Nv v. U.S.*, (Court of Intl. Trade 2007), and *Gerber Food (Yunnan) Co., Ltd. v. U.S.*, 387 F. Supp. 2d 1270, (Court of Int'l. Trade 2005).

In sum, the Department's scope ruling process was compromised by the Department's decision to hold an improper *ex parte* meeting with the petitioner, notwithstanding a lack of any substantial information submitted prior to this meeting. (The petitioner had only made a single substantive submission (P.R.21) at the point that the *ex parte* meeting was held and such submission only contained bare allegations that the production process for CMT was "minor") The Department's refusal to address this failure in any fashion, and critically its refusal

to hold a similar meeting with Elysium, was unlawful.  The bare minimum of due process required such a meeting to Elysium.

**B.** **The Department Should Have Issued an Adequate Memorandum of the *Ex Parte* Meeting**

19 C.F.R. §351.104 and 19 U.S.C. 1677f(3)(B)5 provide that if the Department holds an *ex parte*  meeting it must provide an adequate summary in a timely fashion and must place this on the official record.  This is intended to permit the other party to respond.  19 U.S.C. 1677f(3)(B) states:

> The administering authority and the Commission shall maintain a record of any ex parte meeting between—
>
> **(A)** interested parties or other persons providing factual information in connection with a proceeding, and
>
> **(B)** the person charged with making the determination, or any person charged with making a final recommendation to that person, in connection with that proceeding,
>
> if information relating to that proceeding was presented or discussed at such meeting. The record of such an ex parte meeting shall include the identity of the persons present at the meeting, the date, time, and place of the meeting, and a summary of the matters discussed or submitted. The record of the ex parte meeting shall be included in the record of the proceeding.

19 C.F.R. §351.104 states:

> **(a) *Official record*—**(1) *In general.* The Secretary will  maintain  an official  record  of  each  antidumping  and  countervailing  duty proceeding. The Secretary will include in the official record all factual information, written argument, or other material developed by, presented to, or obtained by the Secretary during the course of a proceeding that pertains to the proceeding. The official record will include  government  memoranda  pertaining  to  the proceeding, memoranda of ex parte meetings…

The official record is therefore devoid of an adequate memorandum.

The Department's memorandum, on its face, is inadequate and does not provide the statutorily mandated information.   While it lists the persons at the meeting and the date of the meeting, it does not summarize the matters discussed or submitted.   As only one attendee on the behalf of the petitioner was a lawyer with outside counsel, as it includes a tour of the facility and was held at the petitioner's production facility, plaintiffs submit that the Court can assume that the meeting was more than a discussion of legal issues. The absence of a summary of this meeting, particularly in a scope proceeding where the parties are not provided a preliminary determination and an opportunity to comment on the Department reasoning through briefing and a hearing, is particularly prejudicial.   Simply put Elysium had no knowledge of the arguments presented by petitioner, nor the nature of any factual assertions about the nature of the material.    Elysium thus had no meaningful opportunity to address the facts presented in the *ex parte* meeting.

The Courts have held that the Department cannot pick and choose which *ex parte* meetings it will memorialize.   The Court stated:

> Whether or not information is in the record via the petition or otherwise, Commerce is not entitled to choose which covered *ex parte* meetings it will memorialize, based on its own identification of redundancies. Parties are entitled to know when and how information was conveyed; they should not have to rely on subtle judgments by Commerce officials or employees about whether factual information is important, is already in the record in some other form, or is even useful to the agency or to the parties.
> *Nippon Steel Corp. v. U.S.*, 118 F. Supp. 2d 1366, 1373 (Ct. Int'l Trade 2000)

Elysium submits that Commerce should also not be allowed to pick and choose which facts from an *ex parte* meeting it will memorialize.

C. **The Department did not consider the Express Language of the Order and Did not Properly Apply Language to the Nature of the Goods**

   1. The Composite Marble Tile is Not Within the Written Scope Language

One of the primary tenets is that when Commerce is called upon to issue a scope ruling, it must take into account the plain language of the order.   The Federal Circuit stated:

> After an AD order is issued, Commerce is often called upon to issue "scope rulings" to clarify the scope of the AD order and determine whether particular products are included within its scope. *Walgreen*, 620 F.3d at 1352 (quoting 19 C.F.R. § 351.225(a)). In making such scope rulings, while the plain language of the AD order is paramount, Commerce must also take into account "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary [of Commerce] (including prior scope determinations) and the Commission." 19 C.F.R. § 351.225(k)(1); *Walgreen, 620 F.3d at 1357*. Consequently, a scope ruling is a highly fact-intensive and case-specific determination.
> *King Supply Company LLC v. United States*, 674 F.3d 1343 (Fed. Cir. 2012) at 1345.

Furthermore, Commerce cannot interpret an order such that it would change the ultimate scope of that order.  As noted by the Federal Circuit:

> Although Commerce "enjoys substantial freedom to interpret and clarify its antidumping duty orders," it can neither "change them," *Ericsson GE Mobile Communications, Inc. v. United States, 60 F.3d 778, 782 (Fed.Cir.1995),* nor interpret them "in a way contrary to [their] terms," *Smith Corona Corp. v. United States, 915 F.2d 683, 686 (Fed.Cir.1990)*. *See also Alsthom Atlantique v. United States, 787 F.2d 565, 571 (Fed.Cir. 1986)* (The International Trade Administration "cannot change the scope of an underlying antidumping determination [to exclude an article] when Treasury has *specifically* included [that] article within the scope of its underlying determination." (emphasis in original)).
> *Wheatland Tube Company v. United States,* 161 F.3d. 1365 (Fed. Cir.

1998) at 1370

Yet in this scope determination, Commerce did just what the Courts told Commerce it could not do – it expanded the scope to incorporate marble articles within the Ceramic Tile order. Commerce must apply these standards and fairly examine the nature of the goods in light of the language of the order.   A number of provisions in the order make it clear that it does not apply to the CMT the subject of this scope application.

The first of these is the required production process.   The order states:

> *Ceramic tiles are articles containing a mixture of minerals including clay (generally hydrous silicates of alumina or magnesium)* **that are fired so the raw materials are fused to produce a finished good** *that is less than 3.2 cm in actual thickness.*

This language is clear and unequivocal.  It contemplates the firing of the **raw materials** in order to fuse such raw materials to produce a **finished good**.  The composite marble tile is the finished good.   The porcelain base layer is not a finished good, it is a material and the finished good is the CMT.    The physical properties make it clear that the imported product is not mere ceramic tile and possesses key physical qualities of the marble.  Simply put, the product in question is not decorated ceramic tile. While a single input in the CMT is a mixture of minerals fired such that the materials are fused, the resultant product is an intermediate good.  The raw materials which make up the finished good are not fired and the final product is not fused together. Rather, the product consists of two pieces of material – one a layer of naturally occurring stone and the other a backing layer of manufactured product permanently bonded (not fused) together by epoxy. Not only is the finished product not fired, if the finished product were to be fired, the firing product would destroy the finished product.

That firing is critical to the final stage is also supported by statements by the

petitioner during the investigation.  In its response to the Department's Supplemental Questionnaire, petitioner stated that a critical point was "{w}hether the constituent inputs of the tile have been fired to the point that the raw materials are fused". (P.R. 10 at 4) In this case, the constituent inputs have not been fired.   The most valuable input, the marble, has not been "fired" to the point that the raw materials are fused. Rather it has been subject to lower temperature drying.     Rather, if the constituent inputs were fired, the raw materials would not only **not** have been fused, but they would also have been destroyed.

Secondly, the porcelain tile constituent is not as valuable as the marble component. This is important as finding that this product is "ceramic" tile, would be placing the proverbial cart before the proverbial horse.   If the product has to be placed in either the ceramic category or the marble category, it will fall in the marble category.   The product is not ceramic tile with decoration, it is marble tile with a supporting base.  In fact, as set forth in its reply to the Petitioner's July 5, 2022 response, Elysium demonstrated that  CMT can be made with a non-porcelain tile base, such as granite, aluminum hydroxide or artificial stone, but CMT cannot be made without marble. (P.R. 24 at  2-3))



Picture of Alternate Base (Reply to Petitioner at Exhibit B P.R. 24 at 14)

Non-Confidential



Picture of Alternate Base (Reply to Petitioner at Exhibit B P.R. 24 at 18)



Picture of Alternate Base (Reply to Petitioner at Exhibit B P.R. 24 at 17)

The critical importance of the marble is emphasized by the relative values of the constituent parts. As detailed in its response to the Supplemental Questionnaire, the natural stone comprises [        ] of the cost and porcelain backing only comprises [        ] of total final cost. (C.R. 8 at 9)

Non-Confidential

The porcelain backing is a raw clay biscuit which has been fired but has no glaze or other coating on it.  As illustrated in the purchase orders supplied as **Exhibit S-1,** the cost is about RMB [          ], which is about USD [          ] (based on the exchange rate: 1USD= 6.5RMB). (C.R. 8 at 9, 13 – 21) As illustrated in   the purchased orders supplied as **Exhibit S-1,** the marble block is about RMB [     ] per ton which is about [          ]. The factory can make [     ] sqm of [      ] thickness of marble layer per ton, which is [          ] per sqm. Thus, the cost of marble is 3-4 times the cost of raw porcelain biscuit. (C.R. 8 at 9, 13 – 21)

This data is not only that of Elysium and its supplier. The relative values of the raw materials is further supported by the price information regarding ceramic tile and marble placed on the record by Elysium in its November 1, 2022 response to comments of petitioner. (P.R. 36 at 15 -26)  Such data shows that marble and ceramic tile are sold at different price points.

2. The Operations Undertaken on the Raw Materials are more than Minor Processing Operations

Marble is  a metamorphic rock.   It occurs naturally in nature.   The operations performed on the marble to convert this product into CMT are significant, but critically do not include firing.  The marble is provided in a large block.   This block is then cut into thin slices and then thin wafers.   The slices and wafers are then initially processed and dried.   The slice is then combined with the porcelain base to form a layered biscuit.   This layered biscuit is then dried and subject to treatment in a drying tunnel.   This results in the curing of the epoxy.  The cured biscuit is next sliced in the middle to form unfinished composite marble tiles.   The composite marble tiles are cut to size, calibrated to the thickness, and polished.  These are not minor operations.   The Marble goes from this:



Picture of Marble Block (Exhibit 2 to Scope Application P.R. 9 at 17)

to



Finished CMT (Exhibit 2 to Scope Application P.R. 9 at 23)

These pictures readily illustrate the substantive nature of the processing.

These processing operations were not minor, they were significant. This is readily apparent from an examination of the discussions as to what constitutes minor operations.  While the scope of the order does not directly address the issue of minor processing operations, the claim that the production of Composite Marble Tile is nothing more than a minor processing operation is not supported.   The steps that constitute "minor processing" are listed generally in the scope with respect to operations in third countries.   The scope states:

> Such minor processing includes, but is not limited to, one or more of the following: Beveling, cutting, trimming, staining, painting, polishing, finishing, additional firing, or any other processing

In a similar fashion, the domestic industry has discussed post-firing operations.  The petitioner stated before the International Trade Commission during the investigation:

> *Post-firing Operations* -  After firing, various post-firing operations may be employed.  Polished tiles, for example) will go to a polishing line using abrasives to create a fine polish on the surface. Rectified tiles will go to a cutting line to produce precisely sized tiles. Cutting operations may be at the factory or offsite at another facility to produce a range of modular products. This is especially true for very large tiles (commonly called slabs or panels and produced in sizes up to 5' *x* 15' (or larger)_which may be cut at the factory but are also commonly shipped as produced in large sizes and cut in a separate facility or even on the job site.

Petition for Antidumping and Countervailing Duties at Page 12 as provided in Exhibit 4 to Elysium's Scope Ruling Application (P.R. 10)

As discussed in detail in Section II.D above, the marble was subject to more than 6 processing steps, including the splitting of the multi-layer biscuits into raw CMT.  Splitting is more than "cutting".  Petitioner has characterized cutting by stating "Rectified tiles will go to a cutting line to produce precisely sized tiles. Cutting operations may be at the factory or offsite at another facility to produce a

range of modular products." (P.R. 10) In other words, cutting is the operation to cut the product to the final shape.  In contrast, splitting is an intermediate step and is far more complex than mere cutting.   As illustrated in the following photograph, the CMT was also subject to a curing process using a large curing tunnel.



Curing tunnel with product inside (P.R. 9 at 19)

 In sum, the resultant product is not the result of "minor processing".

### 3.  The Marble is More than "Mere" Decoration

The final allegation against the CMT is that the marble is mere decoration. This allegation is belied by the facts.  While the marble CMT may be more attractive than the plain porcelain base layer, appearance is not the only property provided by the marble layer. (P.R. 36)

In evaluating this, the Court must decide what constitutes "decoration".   In doing so, the courts refer to the ordinary meaning of words as reflected in Dictionaries and similar sources.  The court stated:

> In order to ascertain the "established meaning, "of a term such as the word "identical," it is appropriate to consult dictionaries. *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001)(Citations omitted)

 See also *NSK Ltd. v. United States*, 115 F.3d 965, 974 (Fed.Cir.1997), *Int'l Bus. Machs. Corp. v. United States*, 201 F.3d 1367, 1372 (Fed.Cir.2000), and *Best Power Tech. Sales Corp. v. Austin*, 984 F.2d 1172, 1177 (Fed.Cir.1993).

The term "decorative" is defined as follows:

Dictionary.com "serving or tending to decorate"

Merriam-Webster: "serving to decorate especially : purely ornamental".

Oxford English Dictionary: "Having the function of decorating; tending to, pertaining to, or of the nature of decoration."

Collins: "Something that is decorative is intended to look pretty or attractive. The curtains are for purely decorative purposes and do not open or close."

Longman: "pretty or attractive, but not always necessary or useful."

 The marble constituent is not "purely" ornamental nor is it "intended to look pretty or attractive" nor it is "pretty or attractive, but not always necessary or useful?. The marble component is more than merely decorative.  It supplies the physical characteristics of natural stone to the floor.  If natural stone did not provide specific characteristics, and was essentially identical to tile, it would never be used in any application as it is more costly.  This, alone, is evidence that natural stone is more than merely decorative.  Further, the marble has specific criteria as enumerated in the chart provided in Elysium's reply to the Petitioner's July 5, 2022 response which set it apart from Tile and other surface materials. (P.R. 24 at 27)

In sum, the marble provides key characteristics to the CMT.  The CMT is not ceramic tile.  The marble is more than a "mere" decoration, providing the greatest material value, and providing valuable properties to the end product.   As installed, only the marble component is accessible to the end user.   The porcelain tile component is nothing more than a supporting material.

V. **CONCLUSION**

In conclusion, the facts and the law are quite clear.   Initially, the Department's scope investigation was procedurally defective.   The Department should not have held an *ex parte* meeting with the petitioner at the petitioner's production facility.   The Department further compounded this error by refusing to generate an adequate memorandum for the record providing details about such meeting.   The Department further compounded both of these errors by refusing to provide a meeting with Elysium.

Secondly, notwithstanding the procedural flaws in the investigation, based on the facts of record, it's clear that the product the subject of the scope ruling was outside of the scope of the order.   The express language of the order states that the product must be "***fired so the raw materials are fused to produce a finished good".*** The facts establish that the finished good is not fired, and that any firing occurs at an early stage of the production process.   Quite to the contrary, if all the raw materials were filed, a finished good would not result and the finished good would be destroyed.

Furthermore, the operations undertaken on the raw materials, including the marble, were substantial and were not minor processing operations.   It is also clear that the marble component, which is also the most valuable component, is more than mere decoration and is functional.

Accordingly, the Court should remand this matter to the Department with instructions that the Department find that the CMT the subject of the Elysium

Scope request is, as a matter of law, outside the scope of the order and that the Department issue notice of the determination and liquidation instructions to that effect.

Respectfully submitted,

/s/ David Craven
David Craven

Counsel to Elysium Tiles, Inc and Elysium Tile Florida, Inc

Dated: August 28, 2023