Slip Op. 24-80

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ELYSIUM TILES, INC., AND ELYSIUM TILE FLORIDA, INC., | |
| Plaintiffs, | |
| v. | |
| UNITED STATES, | Before: Jane A. Restani, Judge |
| Defendant, | Court No. 23-00041 |
| and | |
| THE COALITION FOR FAIR TRADE IN CERAMIC TILE, | |
| Defendant-Intervenor. | |

## OPINION AND ORDER

[Remanding Commerce's Final Scope Ruling regarding whether a product is covered by antidumping duty and countervailing duty orders on ceramic tile from the People's Republic of China.]

Dated: July 18, 2024

David J. Craven, Craven Trade Law LLC, of Chicago, IL, argued for plaintiffs Elysium Tiles, Inc. and Elysium Tile Florida, Inc.

Christopher A. Berridge, Trial Attorney, Commercial Litigation Branch, U.S. Department of Justice, of Washington, DC, argued for the defendant. With him on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and L. Misha Preheim, Assistant Director. Of counsel on the brief was Vania Y. Wang, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

David M. Spooner, Barnes & Thornburg, LLP, of Washington, DC, argued for defendant-intervenor The Coalition for Fair Trade in Ceramic Tile. With him on the brief was Nicholas A. Galbraith.

Restani, Judge:  This action is a challenge to the final scope ruling of the United States Department of Commerce ("Commerce") regarding composite tile imported by Elysium Tiles, Inc. and Elysium Florida Tile, Inc. (collectively, "Elysium").  The final scope ruling found that Elysium's compsite tile is included in the antidumping duty ("AD") and countervailing duty ("CVD") orders on ceramic tile from the People's Republic of China (collectively, the "Orders").  Final Scope Ruling on Elysium's Composite Tile, P.R. 40 (Jan. 25, 2023) ("Scope Ruling").  The composite tile in question consists of a base layer of porcelain tile, a layer of epoxy, and a thin top layer of marble.  Id. at 4.  Commerce ruled that the marble layer is a "decorative feature," and is thus within the scope of the Orders.  Id. at 8.  Elysium assert the marble layer is more than mere decoration, and that the composite tile is therefore not within the scope of the Orders.  The United States ("Government") and the Coalition for Fair Trade in Ceramic Tile (the "Coalition") ask that the court sustain Commerce's scope ruling.

Additionally, Elysium challenge Commerce's actions after an ex parte meeting between Commerce and a domestic tile producer, Florida Tile, Inc ("Florida Tile").  Elysium contend both that the meeting was improper, and that the summary memorandum, placed on the record in compliance with 19 U.S.C. § 1677f, was inadequate.  For the following reasons, the court remands Commerce's final scope ruling as unsupported by substantial evidence and not in accordance with law.

## BACKGROUND

### I.    Antidumping and Countervailing Duty Orders

On June 1, 2020, Commerce issued antidumping and countervailing duty orders on ceramic tile from the People's Republic of China.  Ceramic Tile From the People's Republic of China: Antidumping Duty Order, 85 Fed. Reg. 33,089 (Dep't Commerce June 1, 2020); Ceramic Tile

From the People's Republic of China: Countervailing Duty Order, 85 Fed. Reg. 33,119 (Dep't

Commerce June 1, 2020) (collectively, the "Orders").  Commerce defined the scope of the Orders,

in relevant part, as follows:

> The merchandise covered by [these Orders] is ceramic flooring tile, wall tile, paving tile, hearth tile, porcelain tile, mosaic tile, flags, finishing tile, and the like (hereinafter ceramic tile). Ceramic tiles are articles containing a mixture of minerals including clay (generally hydrous silicates of alumina or magnesium) that are fired so the raw materials are fused to produce a finished good that is less than 3.2 cm in actual thickness. All ceramic tile is subject to the scope regardless of end use, surface area, and weight, regardless of whether the tile is glazed or unglazed, regardless of the water absorption coefficient by weight, regardless of the extent of vitrification, and regardless of whether or not the tile is on a backing. Subject merchandise includes ceramic tile with decorative features that may in spots exceed 3.2 cm in thickness and includes ceramic tile "slabs" or "panels" (tiles that are larger than 1 meter[2] (11 ft.[2])).
>
> Subject merchandise includes ceramic tile that undergoes minor processing in a third country prior to importation into the United States. Similarly, subject merchandise includes ceramic tile produced that undergoes minor processing after importation into the United States. Such minor processing includes, but is not limited to, one or more of the following: Beveling, cutting, trimming, staining, painting, polishing, finishing, additional firing, or any other processing that would otherwise not remove the merchandise from the scope of [these Orders] if performed in the country of manufacture of the in-scope product.
>
> Subject merchandise is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under the following subheadings of heading 6907: 6907.21.1005, 6907.21.1011, 6907.21.1051, 6907.21.2000, 6907.21.3000, 6907.21.4000, 6907.21.9011, 6907.21.9051, 6907.22.1005, 6907.22.1011, 6907.22.1051, 6907.22.2000, 6907.22.3000, 6907.22.4000, 6907.22.9011, 6907.22.9051, 6907.23.1005, 6907.23.1011, 6907.23.1051, 6907.23.2000, 6907.23.3000, 6907.23.4000, 6907.23.9011, 6907.23.9051, 6907.30.1005, 6907.30.1011, 6907.30.1051, 6907.30.2000, 6907.30.3000, 6907.30.4000, 6907.30.9011, 6907.30.9051, 6907.40.1005, 6907.40.1011, 6907.40.1051, 6907.40.2000, 6907.40.3000, 6907.40.4000, 6907.40.9011, and 6907.40.9051. Subject merchandise may also enter under subheadings of headings 6914 and 6905: 6914.10.8000, 6914.90.8000, 6905.10.0000, and 6905.90.0050. The HTSUS subheadings are provided for convenience and customs purposes only. The written description of the scope of [these Orders] is dispositive.

Ceramic Tile From the People's Republic of China, 85 Fed. Reg. 33,089, 33,117 (Dep't Commerce

June 1, 2020) ("Scope Order Appendix").

## II.    Description of Merchandise

Drawing from the scope ruling application submitted by Elysium, Commerce proceeded

with the following description of the merchandise:

> The product at issue is composite tile made of multiple layers of material. The base
> layer is made from porcelain, a vitrified ceramic. The middle layer consists of an
> aviation grade epoxy which is used to permanently bond the base layer to the top
> layer. The top layer consists of marble. The tile is approximately 12 to 15 mm thick.
> The tile is produced in six sizes – 300 by 300 mm, 300 by 600 mm, 600 by 600
> mm, 800 by 400 mm, 800 by 800 mm, and 1200 by 600 mm.

Scope Ruling at 4.

## III.    Scope Inquiry Proceedings

Elysium initially filed a scope application on April 11, 2022.  Scope Ruling Application,

C.R. 1, P.R. 1 (Apr. 11, 2022).  Commerce rejected the application on May 12, 2022, because it

determined that the Coalition, a party entitled to service, was not properly served.  Denial of Scope

Application, P.R. 5 (May 12, 2022).  On May 24, 2022, Elysium refiled its scope application with

an explanation regarding service.  Request to Reconsider and Scope Application, C.R. 2, P.R. 8

(May 24, 2022); Request to Reconsider and Scope Application at Attachment II, C.R. 2, P.R. 8

(May 24, 2022) ("Scope Ruling Application").  On June 2, 2022, Commerce initiated its scope

inquiry to determine whether Elysium's composite tile is covered by the Orders.  Initiation of

Scope Inquiry, P.R. 15 (June 2, 2022).

On September 20, 2022, Commerce officials conducted an ex parte visit to the production

facilities of Florida Tile, a member of the Coalition.  Florida Tile Visit Memorandum, P.R. 26

(Sept. 26, 2022) ("Ex Parte Memo").  On September 26, 2022, Commerce placed a memorandum

documenting the September 20, 2022, visit on the record of the instant proceedings.  Id.  The

memorandum listed the date and location of the visit, an extremely sparse list of events, and a list

of participants in the meeting.  Id. at 1–2. On October 11, 2022, Elysium filed an objection to the

September 20, 2022, ex parte visit and requested an ex parte meeting with Commerce.  Objection to Meeting, Request for Further Detail and Request for Meeting at 1–3, P.R. 32 (Oct. 11, 2022). Commerce did not reply to the objection or grant an ex parte meeting to Elysium.

On January 25, 2023, Commerce issued a final scope ruling, determining that the composite tile imported by Elysium is within the scope of the Orders.  Scope Ruling at 1.  This action followed.

## JURISDICTION & STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2018) and 19 U.S.C. § 1516a(a)(2)(B)(vi) (2018).    Section 1516a(a)(2)(B)(vi) provides for judicial review of a determination of "whether a particular type of merchandise is within the class or kind of merchandise described in an . . . antidumping or countervailing duty order."  19 U.S.C. § 1516a(a)(2)(B)(vi).  In conducting its review, the court must set aside any determination, finding, or conclusion found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  Id. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.    Commerce's Ex Parte Communication Memorandum was Inadequate

Elysium primarily argues that the ex parte memorandum failed to "provide an adequate summary of matters discussed."[1]  Pl. Elysium Br. in Supp. of its Rule 56.2 Mot. for J. on the Agency R. at 7, ECF No. 26 (Aug. 31, 2023) ("Elysium Br.").  Elysium assert that there was "no meaningful opportunity to address the facts presented" in the meeting due to the inadequate

---

[1] Elysium argue that Commerce's denial of a requested ex parte meeting with Elysium following the September 20 visit with Florida Tile was improper.  Elysium Br. at 24.  Elysium fails to adequately support this assertion with any precedent, regulation, or statute requiring such a meeting, and the relevant statute makes no reference to such a requirement.  See id. at 24; 19 U.S.C. 1677f(a)(3).

memorandum, and that the ex parte meeting "allowed petitioner to provide 'secret' information and argument about the purported production process," giving an "impression of favoritism." Id. at 22–23, 26. Elysium ultimately claim that Commerce's scope ruling process was "compromised" because of the "decision to hold an improper ex parte meeting," along with the insufficiency of the memorandum provided. Id. at 24–25.

The government argues that Commerce "adequately summarized" the visit and complied with 19 U.S.C. § 1677f(a)(3). Def. United States Br. in Supp. of its Rule 56.2 Mot. for J. on the Agency R. at 13, ECF No. 35 (Dec. 13, 2023) ("Gov. Br."). The government contends that the memorandum was filed because Florida Tile is a member of the Coalition, and that 19 U.S.C. § 1677f(a)(3) required documentation be placed on the record. Gov. Br. at 13. The government asserts that the "simplest" explanation for the lack of information is that there was no information relating to the proceeding presented or discussed, and that "had factual information or arguments been exchanged, Elysium would have been informed of this exchange in the summary . . . and would have had a chance to respond." Id. at 14.

19 U.S.C. § 1677f(a)(3) (2018) governs ex parte meetings, and lists requirements for additions to the record following such meetings. It states, in relevant part:

> (3) Ex parte meetings.
> The administering authority and the Commission shall maintain a record of any ex parte meeting between—
>> (A) interested parties or other persons providing factual information in connection with a proceeding, and
>> (B) the person charged with making the determination, or any person charged with making a final recommendation to that person in connection with that proceeding,
>> if information relating to that proceeding was presented or discussed at such meeting. The record of such an ex parte meeting shall include the identity of the persons present at the meeting, the date, time, and place of the meeting, and a summary of the matters discussed or submitted . . . .

19 U.S.C. § 1677f(a)(3) (emphasis added).

As written, this statute requires a summary of the meeting <u>only if</u> information relating to the proceeding was presented or discussed.  <u>See id.</u>  The statute does not, however, explicitly describe the depth or breadth required of a summary.  <u>See id.</u>  The court has previously held that such summaries do not need to be a "complete and fulsome discussion."  <u>Valeo N. Am., Inc. v. United States</u>, 610 F. Supp. 3d 1322, 1342–43 (CIT 2022).  In the context of Enforce and Protect Act ("EAPA") investigations, however, the court has held that summaries of confidential information should contain "enough context and [] provide sufficient summaries to determine what type of information was redacted" and is thus unavailable to an opposing party.  <u>CEK Grp. LLC v. United States</u>, 633 F. Supp. 3d 1369, 1377 (CIT 2023).  At a minimum, where information is redacted or otherwise unavailable to the parties, a summary of the matters discussed or submitted must be included in order to allow rebuttal by the opposing party.  <u>See Royal Brush Mfg. v. United States</u>, 75 F.4th 1250, 1262 (Fed. Cir. 2023) (referring generally to the right to rebuttal when officials have "received new and material information by means of <u>ex parte</u> communications").  "[P]arties are entitled to know when and how information was conveyed; they should not have to rely on subtle judgments by Commerce . . . about whether factual information is important . . . or is even useful to the agency or to the parties."  <u>Nippon Steel Corp. v. United States</u>, 24 CIT 1158, 1165, 118 F. Supp. 2d 1366, 1373 (2000).  A substantive summary will therefore provide sufficient context as to the type of information conveyed in order to allow an opposing party to decide if there is something to rebut.

After visiting Florida Tile's production facilities, Commerce placed a memorandum summarizing the visit on the record.  <u>Ex Parte Memo</u>.  The memorandum states, in its entirety:

On September 20, 2022, Department of Commerce officials visited the Lawrenceburg, Kentucky production facilities of Florida Tile, Inc. (Florida Tile), a member of the petitioning party in the above-referenced proceedings. Our visit

included a tour of Florida Tile's operations and a question and answer session with
Florida Tile employees. A list of participants is contained in the Attachment.

Ex Parte Memo at 1.  A list of participants was also attached.  Id. at 2.

This summary is plainly insufficient.  A scope determination may examine, among other
factors, how an item is produced.  See 19 C.F.R. § 351.225 (2024).  Information about how the
domestic industry produces ceramic tile, as well as information on the variety of products produced
by the domestic industry, is information for Commerce to consider in determining whether
Elysium's product falls within scope.  See, e.g., Ceramic Tile from the People's Republic of China:
Scope Decision Memorandum for the Final Determinations at 4, A-570-108, C-570-109 (March
30, 2020) ("Scope Decision Memorandum") (placed on the record by Elysium in C.R. 4, P.R. 10
on May 24, 2022) (finding that a product was intended to be in scope because a similar product
was made by domestic producers).  During the tour of the production facility, Commerce
presumably learned what type of processing Florida Tile conducts and gained hands on experience
with that type of processing and whether it appeared to be "minor."[2]

Further, the summary does not even state whether it was Commerce or Florida Tile asking
or answering questions.  See Ex Parte Memo.  Both could be problematic, but it is certainly difficult
for Elysium to properly address either without knowing which occurred.  In the case where
Commerce asked questions, it could have gained insight into processes relevant to the scope
determination.  In the alternative, answering questions from employees provides Commerce with
an opportunity to gain additional perspectives on issues such as processing.  While it is not
necessary to include a transcript of the session, a substantive summary would indicate at least the
the types of questions asked, as well as the role the parties played in the question and answer

---

[2] As discussed later, the definition of "minor processing" is a critical component to this scope
determination.  See infra pp. 13–18.

session.

The government's assertion that the memorandum was only included because interested parties met is unpersuasive. A memorandum is required "if information relating to the proceeding was presented or discussed." 19 U.S.C. § 1677f(a)(3). If there were no information relating to the proceeding presented or discussed at the September 20 meeting, then Commerce should either not have included a purported summary of the meeting in the record, [3] or reported that no information was exchanged in its memorandum, in accordance with the plain statutory requirements. See id. Accordingly, absent an indication otherwise, the court presumes that information was exchanged, meaning that a substantive summary of the ex parte meeting must be provided.

The government contends that Elysium must demonstrate material prejudice, because "procedural irregularities by an administrative agency are not per se prejudicial." Gov. Br. at 12 (quoting Timken Co. v. Regan, 4 CIT 174, 179, 552 F. Supp. 47, 52 (1982)). The government contends that Elysium's arguments are mere speculation and are otherwise unsupported by the record. Id. at 12. It further asserts that a traditional "harmless error" analysis should be applied. Id. at 12; see also Suntec Indus. Co. v. United States, 857 F.3d 1363, 1368–72 (Fed. Cir. 2017) (stating that a person seeking relief "has the burden of showing prejudice caused by the error"). Harmless error analysis, however, is inapplicable in this situation, as procedural due process violations arising from ex parte communications are "not subject to the harmless error test" when new and material information is introduced. Id. (quoting Stone v. F.D.I.C., 179 F.3d 1368, 1377 (Fed. Cir. 1999)). The government seems to ask Elysium to perform the impossible task of

_____

[3] The court notes, however, that parties should not have to rely on subtle judgments by Commerce as to what information is important. Nippon Steel Corp., 24 CIT at 1165, 118 F. Supp. 2d at 1373. Here, the tour alone could provide information in need of rebuttal. See supra at pp. 8.

showing that they were prejudiced by material information that Elysium cannot determine exists. Elysium does not need to demonstrate how it was prejudiced in this situation; the insufficiency of the memorandum requires remediation before the matter may be addressed by the plaintiff and reviewed by the court.

**II.**  **Commerce's Ruling is Not Supported by Substantial Evidence**

Elysium argue that the porcelain base and marble layer are each "raw materials" used to create the composite tile, with the porcelain serving as the backing for the marble.  Elysium Br. at 28.  Thus, Elysium contend, the composite tile is not within the scope because (1) the marble layer creates a functionally different product as compared to the porcelain backing alone; (2) firing the "raw materials" would destroy the tile; and (3) major processes occur to obtain the marble layer. Id. at 3–4.

Under Elysium's view of the composite tile, the tile is clearly out of scope.  If the scope language is unambiguous, then "the plain meaning of the language governs." OMG, Inc. v. United States, 972 F.3d 1358, 1363 (Fed. Cir. 2020) (citation omitted).  Here, the scope language defines "[c]eramic tiles [as] articles containing a mixture of minerals . . . that are fired so the raw materials are fused to produce a finished good." Scope Order Appendix.  Assuming arguendo that the raw materials are the porcelain, epoxy, and marble layer as Elysium describes, firing them would destroy the epoxy and fail to produce a "finished good."  Elysium Br. at 4.

This is not, however, the government's interpretation.  Instead, the government argues raw materials go into making the porcelain, which is fired, and then the marble serves as a decoration. Gov. Br. at 6.  Under the scope language, ceramic tile may have decorative features, and undergo "minor processing in a third country" such as "painting, polishing, finishing, . . . or any other processing that would otherwise not remove the merchandise from the scope of the Orders if

performed in the country of manufacture of the in-scope product."[4]  Scope Order Appendix.  The government asserts that the porcelain tile itself is the "finished good" described by the language of the scope, and that the marble is a decorative feature that was added via minor processing.  See Gov. Br. at 6.  This theory is not supported by the plain language of the scope, and as set out below, Commerce failed to support its theory with (k)(1) sources or (k)(2) factors.

### A. Legal Standard

When questions arise as to whether a particular product is covered by the scope of an AD or CVD order, Commerce will initiate and conduct a scope inquiry and issue a scope ruling to determine whether or not the product is covered.  19 C.F.R. § 351.225(a) (2022).[5]  The first step in the inquiry is consideration of the language of the Orders.  See Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States, 776 F.3d 1351, 1356 (Fed. Cir. 2015) ("Scope language is the 'cornerstone' of any scope determination.").  If the scope language is unambiguous, then "the plain meaning of the language governs."  OMG, Inc., 972 F.3d at 1363.

If the scope language is ambiguous, as is likely here, Commerce may utilize the primary interpretive sources listed under paragraph (k)(1) of section 351.225 ("(k)(1) sources") to help it determine the meaning of the language of the scope.  19 C.F.R. § 351.225(k); see Meridian Prods., LLC v. United States, 851 F.3d 1375, 1381–82 (Fed. Cir. 2017).  The (k)(1) sources include the descriptions of the merchandise considered by Commerce and the International Trade Commission

---

[4] Although written somewhat convolutedly the court concludes this language is intended to convey that wherever such minor processing is performed it does not affect scope and the parties do not appear to dispute this.

[5] Commerce recently revised its scope regulations, and the changes took effect April 24, 2024. See Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws, 89 Fed. Reg. 20766  (Dep't Commerce Mar. 25, 2024).  The court cites to the prior regulations that were in effect when Elysium submitted its complete scope application.

("ITC") when crafting the scope, as well as previous determinations made by Commerce and the

ITC.   See 19 C.F.R. § 351.225(k)(1)(i).[6]   If Commerce "determines that the sources under

paragraph (k)(1) of this section are not dispositive," Commerce will then consider the factors under

paragraph (k)(2) of the section ("(k)(2) factors").  19 C.F.R. § 351.225(k)(2)(i).  The (k)(2) factors

include (A) the physical characteristics of the product; (B) the expectations of the ultimate user;

(C) the ultimate use of the product; (D) the channels of trade in which the product is sold; and (E)

the manner in which the product is advertised and displayed.[7]   Id.   Finally, "[i]f merchandise

contains or consists of two or more components and the product at issue in the scope inquiry is a

component of that merchandise as a whole," Commerce may adopt the analysis described under

paragraph (k)(3) of this section ("(k)(3) analysis").   Id. § 351.225(k)(3).  The (k)(3) analysis goes

on to consider factors such as whether the "component product would otherwise be covered by the

scope," whether the "component product's inclusion . . . results in its exclusion from the scope,"

and if not, factors such as the "practicability of separating" the components, the value, and the

ultimate function.   Id.

Put simply, the (k)(1) sources assist Commerce in interpreting the scope language, the

(k)(2) factors assist Commerce in determining if the language describes the product at issue, and

the (k)(3) analysis assists Commerce in considering situations where in-scope components are

combined with out-of-scope components.  All of Commerce's analysis, however, must be done in

---

[6] Although they are not determinative when conflicting with the primary interpretive sources listed by § 351.225(k)(1), Commerce may also look to secondary interpretive sources such as any other determinations of the Secretary or the Commission not identified above, Customs rulings or determinations, industry usage, dictionaries, and any other relevant record evidence. 19 C.F.R. § 351.225(k)(1)(ii).

[7] While interpreting a previous version of this regulation, the Federal Circuit has referred to sources that contain information about these factors as "(k)(2) sources."  Sunpreme Inc. v. United States, 946 F.3d 1300, 1306 (Fed. Cir. 2020).

such a way that the scope is not changed, and that the order is not interpreted in a manner contrary

to its terms. Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1072 (Fed. Cir. 2001).

Here, Commerce stated that the (k)(1) sources were determinative, and that consideration

of the (k)(2) factors was not necessary. Scope Ruling at 7. Yet, Commerce only referenced two

(k)(1) sources. Id. at 8–9. Instead, Commerce relied upon information about the purpose, function,

and physical characterics of the product, all of which are (k)(2) factors. Id. at 8; see, e.g., Saha

Thai Steel Pipe Pub. Co. v. United States, 101 F.4th 1310, 1329–31 (Fed. Cir. 2024) (referring to

physical characteristics only when necessary for direct comparison to a characteristic described in

the (k)(1) source). For the purposes of this opinion, the court assumes arguendo that Commerce

found it necessary to consider (k)(2) factors.

### B. The Parties' Focus on the Word "Decorative" is Misplaced

Elysium argue that the marble is more than "mere" decoration as the marble provides the

"physical characteristics of natural stone" to the product. Elysium Br. at 34–35. The government

contends that the marble is decorative, as regardless of any physical characteristics, the marble

layer is indended "to look pretty or attractive" and partially serves a decorative function. Gov. Br.

at 19–20 (citation omitted).

The scope language here does not contain clear exclusionary language. Additionally, it

uses general terms further rendered unclear by nonexclusive examples. Some phrases are clearly

misstated. For example, the scope "includes ceramic tile with decorative features that may in spots

exceed 3.2 cm in thickness . . . ." Scope Order Appendix. At oral argument, all parties agreed

with the court that this clause can not be understood to mean that subject merchandise includes

decorative features of 3.2 cm or more themselves, but rather that if the ceramic tile is made greater

than 3.2 cm in thickness by certain decoration, the tile is still in scope. For example, if a ceramic

tile is 3.1 cm in thickness, and then receives a 2 mm thick coat of paint, it would still be in scope despite the decoration causing the final product to have a thickness of 3.3 cm. See also supra n.4.

Clearly the phrase "decorative features" was meant only as an example of something that could affect the thickness of the final product without impacting the dimensional limitation in the the scope description. This reading is confirmed by the lack of evidence on the record defining "decorative feature." Had the scope language been intended to target decoration with ceramic backing, there would be evidence of this before the ITC or Commerce and the (k)(1) sources would support such an interpretation. In absence of such evidence, the court must conclude that because the product does not exceed 3.2 cm, whether or not the marble is a decorative feature is irrelevant to the scope.[8]

This interpretation is confirmed by the structure of the scope description. The first paragraph clearly defines all ceramic tiles as "articles containing a mixture of minerals including clay . . . that are fired so the raw materials are fused to produce a finished good that is less than 3.2 cm in actual thickness." Scope Order Appendix. The first paragraph then goes on to clarify that differences in end use, surface area, weight, glaze, water absorption coefficient, and vitrification are irrelevant. Id. The second paragraph allows for minor processing to occur without taking the product out of scope, and provides a non-exhaustive list of examples of such minor processing. Id. The third paragraph provides non-determinative guidelines that specify which subheadings of

---

[8] Elysium made several arguments to show that the marble was not merely decoration. See Elysium Br. at 35. Yet, these definitions of decorative would result in items likely contemplated by the orders being excluded from the scope. For example, a company could paint ceramic with gold, thereby dramatically increasing the price. Further, the gold-painted tile would feel like gold, share some physical properties with gold, and be purchased as a replacement for gold flooring. Yet, the product would be painted ceramic tile—a product explicitly described by the scope language. Accordingly, the court rejects Elysium's arguments regarding decoration.

the Harmonized Tariff Schedule of the United States these products are presumed to fall under. Id.

The "decorative features" line is part of the first paragraph, clarifying, as explained, that decorative features cannot be used to render a product out of scope because of the thickness added by a decorative feature.[9]  See id.  Such language does not expand the scope to include all instances where the ceramic tile is used as a backing for decoration, or other additions.

Finally, record evidence, which Commerce failed to reference in its ruling, confirms this interpretation.  In the Scope Decision Memorandum, Commerce considered whether handmade tile was excluded from the scope of the Orders.  Scope Decision Memorandum at 9.  In its consideration, Commerce focused on the technique being used to apply the decoration, rather than the decoration itself.  Id. at 10–11.  Specifically, Commerce determined that the relevant question was not what decoration was being added, but how the decoration was added.[10]  Id.  Similarly, here, the determinative question is not whether the marble layer is decoration, but rather whether the process of applying the layer is so intensive that it goes beyond "minor processing" to the degree that it brings the product out of scope.

**C. The Evidence Does Not Indicate that the Gluing and Splitting of the Marble Slab is "Minor Processing"**

Elysium argue that gluing two porcelain tiles to a marble slice, creating a "biscuit," and then slicing the marble in the middle to form two composite tiles, is not a "minor" operation. Elysium Br. at 31.  The government asserts that so long as each process is minor, there is no limit

---

[9] Commerce specifically relied upon this line in the Scope Decision Memorandum to find that cracked glass decoration did not take a product out of scope despite it causing the product's thickness to exceed 3.2 cm in spots.  Scope Decision Memorandum at 11.
[10] In this instance, Commerce determined that painting a tile by hand rather than through an automated process did not take a product out of the scope.  Scope Decision Memorandum at 11.

to the number of minor processes that would remove Elysium's composite tile from the scope. Gov. Br. at 17–18.

There is no evidence on the record defining "minor processing" beyond the examples given in the scope description.  See Scope Order Appendix.  The scope description does specify, however, that "one or more" of the listed examples may occur without bringing the product out of scope.  Id.  Accordingly, the court concludes that the scope includes products that have undergone any number of minor processes, so long as the minor processes do not change the product so significantly that it cannot be considered to be the product intended to be described in the first paragraph of the scope description.[11]  See id.  Next, as indicated, the scope includes a non-exhaustive list of types of minor processing such as:  "[b]eveling, cutting, trimming, staining, painting, polishing, finishing, [and] additional firing." Scope Order Appendix.  Thus, the court concludes that the scope includes these enumerated processes, as well as processes of a similar nature.

Turning to the product at hand, Elysium's process starts with the sandwiching of two porcelain tiles around a 6 mm thick marble layer, creating a "biscuit" glued together with an epoxy. Elysium Br. at 14–18.  Then, the biscuit is split in half, resulting in two composite tiles with a 3 mm marble top layer.  See id. at 18.  This process requires specialized equipment, and must be conducted at a facility designed for the creation of composite tile.  Id. at 31–34.

---

[11] In the Coalition's case brief during Commerce's investigation, it referred to products clearly outside of the scope such as "ceramic tile that is already incorporated into furniture; trivets; tile coasters; ceramic tile parts of stoves or fireplaces; . . . and ceramic baking stones and hotplates." Scope Case Brief of the Coalition for Fair Trade in Ceramic Tile at 13, A-570-108, C-570-109 (October 14, 2019) (placed on the record by Elysium in C.R. 4, P.R. 10 on May 24, 2022). Although record evidence does not define the process of creating these products, some of them, such as tile coasters, are presumably created through a series of minor processes such as cutting and trimming tile into the appropriate size and shape.

Elysium's processes as described are neither enumerated in the scope description, nor are they so similar to the enumerated processes such that they can be easily considered to be "minor processing." Although the number of steps is not determinative, the complexity of Elysium's processes exceeds the complexity of the processes described in the scope language. Record evidence indicates that the minor processes described by the scope language can occur "on the job site." Ceramic Tile Products from the People's Republic of China, Petition for Antidumping and Countervailing Duties at 12, Inv. Nos. 701-TA-621 and 731-TA-1447 (April 10, 2019) (ITC Petition) (placed on the record by Elysium in C.R. 4, P.R. 10 on May 24, 2022). There is no evidence cited to the court, however, to indicate that the processes Elysium uses can be performed anywhere other than at a specialized facility. Without some evidence that Commerce or the ITC contemplated processes of this complexity as nonetheless "minor," the court is unconvinced Elysium's process can be so considered.

### D. Finally, Commerce's Consideration of Key Evidence was Unreasonable

The government asserts that Commerce properly found the composite tiles to be substantially similar to ceramic tiles. See Gov. Br. at 6. Elysium contend that the composite tile is differentiated as it "possesses key physical qualities of the marble" and its value comes from the use of real marble rather than simply the look of marble. Elysium Br. at 28, 35.

In its ruling, Commerce places significant reliance on the fact that the composite tile is used for the same purpose, functions in the same way, and shares key physical characteristics with ceramic tile. Scope Ruling at 8. Yet, these purposes, functions, and characteristics are shared, to some extent, by all flooring options. To highlight the difference between ceramic and composite tile, Elysium points to a table it submitted comparing ceramic, marble, and composite tile. Scope Ruling Application at 5–6. The table plainly shows the composite tile is a middle ground between

ceramic and solid marble tile on all fronts.  See, e.g., Scope Ruling Application at 5–6 ("Water Absorption. Ceramic Tile: Non-Porous and Non-Absorbent. Traditional Marble: Marble is porous and subject to staining. Composite Marble Tile: The base is non-porous and non-absorbent, while the top surface is absorbent.").  Yet, Commerce relied on this table to show that composite tile is like ceramic tile and therefore should be found to be within scope.  Scope Ruling at 8.  The problem with this interpretation is that table equally supports the opposite conclusion that the composite tile is like marble tile rather than ceramic tile.  A single piece of evidence cannot support one conclusion if it is equally authoritative in its support of an opposite conclusion.[12]

The table plainly indicates that composite tile exists as an ambiguous middle ground between ceramic and marble tile.  There are no calculations or values to indicate that the composite tile is more like marble, or more like ceramic.  The table is ambiguous, and does not support Commerce's interpretation that it indicates the composite tile is essentially ceramic tile with marble decoration.  Commerce's use of the table as evidence that the composite tile is within scope is plainly unreasonable.

**CONCLUSION**

To support its ruling, Commerce must either show under a (k)(1) analysis that the scope language contemplates products such as marble composite tile, or that under the (k)(2) factors the marble composite tile truly is considered a form of ceramic tile in purpose, function, advertising, and use.[13]  Commerce failed to do so here and therefore its ruling is not supported by substantial

---

[12] Although the evidence as a whole can support two inconsistent conclusions under the substantial evidence standard, it is limited by what "reasonable minds might accept as adequate to support a conclusion."  Fleming v. Escort Inc., 774 F.3d 1371, 1375 (Fed. Cir. 2014) (citation omitted).  Reasonable minds may accept inconsistent conclusions from evidence as a whole, but not from a single piece of evidence that provides equal support for each conclusion.

[13] Elysium argue that the "finished good" contemplated by the orders is the composite tile, not the porcelain backing that Commerce considered in its scope ruling.  Elysium Br. at 28.  The

evidence.[14]  Further, the lack of a substantive summary of the ex parte meeting allegedly held "in

connection" with the proceedings renders the determination not in accordance with the law.

      For the foregoing reasons, the court remands to Commerce for a determination consistent

with this opinion.  The remand determination shall be issued within 90 days hereof.  Comments

may be filed 30 days thereafter and any response 15 days thereafter.

    /s/ Jane A. Restani
Jane A. Restani, Judge

Dated: July 18, 2024
New York, New York

---

court need not address this argument as assuming arguendo that Commerce is right, its ruling is
still not supported by substantial evidence.  Nevertheless, based on the plain language of the
scope, the court is unconvinced that these Orders consider porcelain tile, when used as a backing
for another product, to be a "finished good."

[14] On remand, Commerce should consider all issues relating to minor processing and the nature
of the product at hand, whether addressed here or or not.  Further, Elysium waived or did not
exhaust a claim for (k)(3) consideration, but if Commerce finds it relevant it should consider it.